## METROPOLITAN LIFE INSURANCE CO. v. MATILDA STAPLES.

Eastern Section.   January 29, 1927.

No petition for Certiorari was filed.

1. **Insurance. Suicide. Clause in life insurance policy construed to mean the company was not liable in case of voluntary self-destruction.**

Where a life insurance policy provided "if the insured within one year from the issue hereof die by his own hand or act, whether sane or insane, this policy shall become null and void, and the company will return only the premiums which have been received thereunder," and the insurance company insisted this exempted the company from liability in cases of death occasioned by an accidental self-inflicted wound, held suicide still means voluntary self-destruction and the words "die by his own hands" are still synonymous terms, meaning voluntary self-destruction of a sane man. To add the words "whether sane or insane" would not change their character or engraft an exemption for death accidentally caused. They can never carry a meaning of involuntary agency.

2. **Death. Evidence. There is no presumption in favor of voluntary self-destruction when one is found slain.**

There is no presumption in favor of voluntary self-destruction when one is found slain. On the contrary, out of deference to the well known fact that almost universally people love and will defend their lives vigorously, even desperately, rather than destroy them, there is a presumption against self-slaughter.

3. **Evidence. Presumption. The presumption against self-destruction is rebuttable.**

It is known that people do sometimes destroy their own lives therefore that one's life was not self-destroyed is a rebuttable presumption.

4. **Suicide. Evidence. Where presumption against self-destruction is rebutted by circumstantial evidence, the evidence must exclude with reasonable certainty hypothesis of death by other means.**

In an action on a life insurance policy where it was insisted that deceased committed suicide and it was sought to overcome the presumption against suicide by circumstantial evidence held it is essential that the circumstances should not only maintain and support the theory of death by his own voluntary act with equal probability, but; further than this, it is requisite that they should be so strong as to exclude with reasonable certainty any hypothesis of death by accident or act of another.

5. **Insurance. Suicide. Evidence. Burden is on defendant to establish defense of suicide.**

In action on life insurance policy burden is on defendant to establish defense of suicide, and court should not direct verdict for defendant on that issue unless facts and circumstances proved are such as to permit no other reasonable inference.

6. **Insurance. Evidence. Evidence held insufficient to rebut the presumption against suicide.**

In an action to recover on an insurance policy which was defended on the ground that the deceased committed suicide where the evidence showed that if deceased killed himself he would have had to hold the gun in a very

awkward position and there was evidence that several shots had been fired in the room, held that the evidence was not sufficient to establish the defense of suicide.

Appeal from Circuit Court, Knox County; Hon. A. C. Grimm, Judge.

Judgment of lower court affirmed.

W. T. Kennerly, of Knoxville, for appellant.

Jennings, Saxton & Wright, of Knoxville, for appellee.

SNODGRASS, J. This is a suit to recover on a life insurance policy of $1000, and twenty-five per cent penalty thereon upon the theory that payment had in bad faith been unreasonably refused. Various pleas controverting liability and the charge of bad faith were filed, including one of tender of premiums and cost, which under certain terms of the policy, and under certain conditions, was to be the only liability.

The case was tried before the judge and jury, which resulted in a verdict for only the face of the policy with interest, being the sum of $1215. This denied any recovery of penalty, and eliminates consideration of any question that might otherwise have specially pertained thereto.

Motion for a new trial being overruled the Insurance Company has successfully appealed therefrom, and assigns error as follows:

"1. The court committed error in overruling defendant's motion for a new trial on the ground that the evidence was insufficient to support the verdict of the jury, the evidence preponderating in favor of the defendant and against the plaintiff."

"2. The court committed error in overruling defendant's motion for a new trial, because there is no evidence to support the verdict of the jury."

"3. The court committed error in erroneously charging the jury as follows:

" 'To this declaration the defendant has interposed various pleas. However, since the defendant admittedly refused to pay said policy upon the theory that said Albert Staples committed suicide, only the fifth and third pleas will be submitted to you, for the law provides that one who has deliberately taken a particular position in the course of litigation, without mistake induced by the opposite party, must act consistently therewith throughout the litigation.'

"4. The court committed error in erroneously charging the jury as follows:

" 'If said Albert Staples did shoot himself with the intent to take his own life, then your verdict will be for the defendant. If Albert Staples shot and killed himself accidentally—that is, without intent to do so, the defendant is liable for the face value of said policy.'

"5. The court committed error in refusing to charge defendant's first special request submitted at the conclusion of the charge in chief, as follows:

" 'I charge you that if the assured, Albert Staples, died by his own hand or act, whether sane or insane, it was provided that the policy would be null and void, and whether said act resulting in his death was accidental or not, if it was an act of his own hand or was his act, you will find for the defendant and against the plaintiff.'

"6. The court committed error in failing to charge the jury upon the defendant's first, second and fourth pleas and the issues raised thereby, the plaintiff having taken issue upon each of said pleas. The defendant's first plea averred that it was not indebted to the plaintiff on account of the matters sued on in any account. Its second plea averred that it had not wrongfully declined and failed to pay the plaintiff the face of the policy sued upon or any other sum, and denied defendant was lawfully indebted to plaintiff in any amount. The fourth plea averred that the defendant Albert Staples died by his own hand and act, and that under the provisions of said policy the same thereby became null and void, and the defendant was only liable to the plaintiff for the premium paid upon said policy. In this connection the court erred in failing to charge in connection with the fourth plea the matters set up in defendant's sixth plea, wherein the amount of premium paid on said policy, interest accrued to the date of the filing of the bill, and accrued costs to said date, were tendered to the plaintiff. The court in his charge in chief, of his own motion, and without any motion of the plaintiff to strike said plea, entirely disregarded the same and submitted the case to the jury solely upon the issues raised in defendant's fifth plea as to liability, and upon the third plea as to defendant's liability for the statutory penalty of twenty-five per cent. Therein the court erred. He should have submitted all of the issues raised by said pleas for the determination of the jury."

"7. The court erred in overruling defendant's motion for a new trial, which was based upon the misconduct of counsel for the plaintiff in argument of said case to the jury, in that John Jennings, Jr., Esq., attorney for the plaintiff, in his

closing argument to the jury asked the jury to return a verdict in favor of plaintiff, stating that it meant more to the plaintiff than it did to the defendant if a verdict was rendered in favor of the plaintiff.

"This argument was timely objected to by the defendant and the court ruled that it was improper, but that its effect on the minds of the jury was prejudicial to the defendant is evidenced by the jury's verdict."

For convenience hereafter plaintiff in error will be referred to as defendant, and defendant in error will be referred to as plaintiff, as they were styled in the court below.

Aside from the defenses in regard to the penalty, which were by the verdict of the jury settled in favor of the defendant company, the other defenses here as to the main liability can be simplified by a construction of the meaning of a clause in the policy, which brought about the multiplicity of pleas, and this clause is as follows:

"If the insured within one year from the issue hereof die by his own hand or act, whether sane or insane, this policy shall become null and void, and the company will return only the premiums which have been received thereunder."

The deceased, whose life was insured by the policy, came to his death, evidently by a pistol shot wound, within the twelve months after the issuance of such policy, inflicted accidentally or designedly by himself or someone else, and it is insisted by the defendant that the clause above set out assures an exemption from liability, even though it should be found that the death was occasioned by an accidental, self-inflicted wound.

The Circuit Judge did not think so and, we think, properly construed the clause to mean that suicide was the only thing meant by the exempting clause referred to, and we think properly declined to instruct the jury that an accidental, self-infliction of the wound, from which death resulted within the time, would render the policy null and void, evidencing no liability.

Defendant refers to the case of Phadenhauer v. Germania Life Ins. Co., 7 Heisk., 567, and undertakes to distinguish that case from the one at bar, in that it is claimed that the words "whether sane or insane" is a feature of the present policy. The clause in the 7th Heiskell case just referred to under which the defense was made, was as follows:

"That if the person aforesaid shall die by suicide, or by his own hand, or in consequence of an attempt to commit suicide or to take his own life, etc., the policy shall cease and be void."

Defendant in that case claimed suicide, and the plaintiff sought to prove insanity to negative the idea that it was the voluntary act of a sane man. There was no question but that it was suicide. The court said:

> "The proof makes a clear case of suicide or voluntary self-destruction of life. The deceased was found dead in his stable, hanging by a rope to a post. That he took his own life is not controverted."

The verdict was for the defendant and the plaintiff appealed. The error relied on for reversal was to the charge of the court, and that was not so much with the court's definition of insanity as it was with the court's explanation of the words "die by his own hands," that was used in the contract. The Circuit Judge told the jury that these words were not used in the contract as synonymous with suicide, but were intended to cover some case that would not amount to technical suicide. While the Supreme Court expressed some doubt as to their understanding of the judge's charge, they held that the words "die by his own hands" were synonymous with suicide, and meant no more, and reversed the case for that reason.

Suicide still means voluntary self-destruction, and the words "die by his own hands" are still synonymous terms, meaning voluntary self-destruction. To add the words "whether sane or insane" would not change their character or engraft an exemption for death accidentally caused. They can never carry a meaning of involuntary agency.

The proof narrowed the issues, we think, to the single question of suicide or voluntary agency, upon the main issue of any liability, conditional upon which were the other issues of penal liability. The jury found the main issue in favor of the plaintiff, but the other issues, as to liability for penalty, in effect, in favor of defendant. It was therefore not material to consider whether or not if there were other issues the defendant pitched the defense solely upon the claim of suicide and is estopped to insist upon any other. There were really no other primary issues, from the concession in the proof, to be determined.

It was admitted that the policy was issued upon the life of the deceased, that it was in force at his death, and it was the uncontroverted proof that he came to his death by a gunshot or pistol wound within the one year period. The only question, therefore was, was the death voluntary self-destruction, or was it involuntary, the result of the accidental agency of self or another, or the voluntary act of another? We think the policy was designed to and did secure the life of the deceased within said period against everything except voluntary self-destruction, as stated in

the case of Phadenhauer v. Germania Life Ins. Co., supra, though insanity under the terms of the policy in question will not avail to relieve the case of suicide from being considered a voluntary act of a self-destroyer. Even insane persons may voluntarily destroy themselves, and they frequently do. Becoming insane would not invalidate the policy, and the beneficiaries of such insane person would be entitled to recover for any accidental death, even though the insane person might have accidentally caused it. In order to escape liability it would still be necessary to prove that such a one intentionally caused it. There is no presumption in favor of voluntary self-destruction when one is found slain. On the contrary, out of deference to the well known fact that almost universally people love and will defend their lives vigorously, even desperately, rather than destroy it, there is a presumption against self-slaughter. Insurance Co. v. Bennett, 90 Tenn., 256; Persons v. State, 90 Tenn., 295; Fisher v. Insurance Co., 124 Tenn., 508; Railroad Co. v. Herb, 134 Tenn., 401; Brown v. Sun Life Ins. Co., (Tennessee Supreme Court) 51 L. R. A., 252.

Nevertheless it is likewise known that people do sometimes destroy their own lives, therefore that one's life was not self-destroyed is a rebuttable presumption.

With the proof before the court as presented by this record, and aided by such presumption, which itself is legal proof, we think there was not only evidence to sustain the verdict, but we do not really see how the jury could have found otherwise. The evidence was circumstantial that was relied upon to overcome this presumption. It was therefore essential that the circumstances should not only maintain and support the theory of death by his own voluntary act with equal probability, but, further than this, it was requisite that they should be so strong as to exclude with reasonable certainty any hypothesis of death by accident or act of another. Tabor v. Mutual Life Ins. Co. of N. Y., (Circuit Court of Appeals, 4th Circuit, June 8, 1926) This is a recent case, but it cites a number of cases from different states and from the Supreme Court of the United States as sustaining the doctrine, which, indeed, is but a declaration of a fundamental principle of the law of circumstantial evidence. The burden is on the defendant to establish defense of suicide, or intentional self-destruction, even of an insane person, to escape liability.

In the recent case of the Equitable Assur. Soc. of the U. S. v. Stinnett, (Circuit Court of Appeals, 6th Circuit, June 9, 1926) it was held that

"In action on life policy burden is on defendant to establish defense of suicide, and court should not direct verdict for de-

fendant on that issue unless facts and circumstances proved are such as to permit of no other reasonable inference.''

It can not be said of the evidence offered by this record that death by any means other than self-destruction has been reasonably negatived. There are twó circumstances involved in this investigation which lead us to conclude that the death of the deceased was not self-destruction. If the Colt's automatic pistol described is the one that killed the deceased, it is shown that there are three operations required to fire it, beginning when it is resting in safety. On the side of the pistol is a little catch. When it is up the pistol is in safety and can not be fired. To get ready to fire it this safety has to be pushed down, then to fire it you must at the same time grasp and press the handle and pull the trigger. This pressure, it would seem, is best secured when held normally for ordinary firing. To have inflicted the wound upon the right eyebrow, (the deceased being left handed) and for the bullet to have ranged as it did, the pistol would have to have been held abnormally, entailing difficulty to make the pressure and pull the trigger at the same time. There are too many vulnerable places about the head for a suicide to have selected the spot at so much inconvenience or difficulty. Arguing against this theory it is stated in the brief for the plaintiff, that one startling fact gleaned from a consideration of the very many suicide cases in our reports is, that universally it appears that where an intentionally self-inflicted wound from a pistol was found, the wound (being a right handed person) is always found in the right side of the hand, whereas with a left handed person it is in the left side of the head; that this characteristic has so obtained as to excite the comment of the courts. Whether or not this argument would be regarded as competently bolstered by the citations, it at least accords with all human probability; and we think, it being shown that the deceased was a left handed man, he would not naturally have selected the right side or front of his head.

Another thing, the barrel of the pistol was some six inches in length, and Dr. Clark, a physician and surgeon, a graduate of the Alabama Medical College and the Hurst University, for fifteen years a practitioner, who testifies to considerable experience with gunshot wounds, and who probed the wound and traced the range of the bullet, said there were no powder burns. Further that there was a slight discoloration about the size of a quarter, just what would usually be around any wound where a bullet enters; that discolorations around the entrance of a bullet are caused by congestion of the surrounding tissues; that this discoloration was not a distinct powder burn at all, but due, he considered, to

discoloration and that a revolver held anywhere within a foot of a man's head would leave a distinct powder burn. He traced the bullet as entering in or above the right eyebrow, at what is known as the superior orbital region, the area of the temple bone. He said that the bullet went in and went transversely to the base of the brain, and lodged just at the base of the brain on the left side; that it entered and took a course downward and backward and lodged at the lower portion of the brain. He found it, slightly battered, inside of the skull and back of the left ear. He was asked to take the gun and demonstrate the position one would have to be in to fire a ball into the body at the path that ball followed. He endeavored to do so, and was asked:

"Q. Can you get your finger on the trigger and do that? A. It would be a pretty hard job, because the bullet entered here and went back this way, now it would have been possible for that bullet to have gone straight through there and gone to the right, but it went straight back, and the way it came in there, I can't get it fixed in my mind—"

Mr. Kennerly: "Don't tell that."

"Q. In endeavoring to get that gun in that position, did you have it in a natural position, or in a strained position? A. You would have to get it in a very awkward position to get the gun fixed for the bullet to range in that direction. You would have to get it in a very awkward position, in other words, you would have to make special preparation for that."

We are satisfied that Dr. Clark would know and detect a powder burn from such an examination as he made. We are equally satisfied that a suicide would not have gone to such inconvenient and difficult lengths. It is true it is claimed that a small powder burn was shown by Chief City Detective A. L. Wells, but it is doubtful if the witness meant to testify that the small dark circle was a powder burn. Quoting a part of the evidence set out in the insistence, it is:

"Q. Have you seen men that were shot with white or smokeless powder, that was shot right close to them? A. Yes, sir.

"Q. Does or not that smokeless or white powder leave much mark or powder burn on them? A. The powder don't seem to scatter, just makes a circle around the hole, will show just a circle around it, just a little darker.

"Q. Did you or not see that kind of a circle around the hole in this man's head? A. He had a small circle; I would say the circle, just from what I recollect about it, a dime probable would cover the circle, including the hole.

"Q. That was a powder burn circle you refer to now? A. It was darker, yes sir.

"Q. I will ask you whether or not the closer the gun is held to the man when he is shot, the smaller powder-burn circle it will make? A. Yes sir.

"Q. At an inch from a man's forehead it would be smaller than at a foot? A. Yes sir, it would be four times as small."

He was asked on cross-examination:

"Q. That little circle you found around the bullet hole there was just a little dark ring, you would not say it was made by a powder-burn? A. No sir, it just seemed to be perfect, in place of having little holes it seemed to be perfectly discolored.

"Q. Just a dark discoloration? A. About the size of a dime, in my recollection."

Added to this there was an utter lack of motive for self-destruction shown. On the contrary on the evening before he appeared cheerful and happy, and was joking or otherwise talking about "going to see his lady love." A preparation had been made for the morning meal that was to follow, and was being made for clean clothes to be worn thereafter. Certain it is, we think, that unless formed very soon preceding the deed there was no thought in his mind of destroying himself the afternoon preceding. His habits of industry were good, and his earning capacity, about ninety dollars per month, was steadily employed. He must have accumulated some money. All the indications are that he was in love with life and its kindly beneficiary. But on the morning near the 6th of January he failed to report for work, and upon an effort to find out the reason why he was discovered lying in his own bed, upon his right side, with the pistol clapsed in his left hand, bloodstained from the stream that trickled from the wound. The cover was on, and one or more cartridge shells from his or a similar pistol was on the covering bedclothes, and one or more similar shells were on the floor, according to the testimony of the policemen. The doors were locked and entrance had to be effected by breaking a window, that had likewise been secured against entrance from without by nails. There were two rooms to his rented house which was situated on an alley not very far from neighbors. These rooms were a kitchen and living room. The connecting door was fastened within the living room by a string wrapped around a nail. The door leading outward from the kitchen was fastened by a bar, in place. The door leading outward from the living room was fastened by a spring or yale lock on the inside. Mr. Wells says there were three or five shells, he does not remember, and that his recollection is there were some bullet holes in the walls, but he did not want to say there was. He then recollected that there was one place where there was a bullet hole they found, and that he did not recollect where it was. The failure to observe and recollect

these important particulars surrounding a tragic mystery in a chief of detectives has a tendency to shatter the idealism with which Sherlock Holmes stories have surrounded these officers, for to us they are mute evidence of the manner of the tragedy in which the negro's life passed. They visualize a struggle, not of brawn and muscle, but with automatic pistols, near the middle of the night, after the deceased had retired, most probably. The condition of the wound, the absence of burns, the unnatural position in which the pistol must have been held if the death had been self-inflicted, the cartridge shells upon the bed and the floor, the holes in the walls and ceiling of the building point, we think, indubitably to other agency of death than that by his own hand. This arrival and other circumstances will enable a shrewd fancy of more of this tragedy. Aroused by either a guest or by one who had gained access to his room, the shot or shots evidenced by the ejected shell or shells upon the bed clothing were fired by the deceased. The other shots evidenced by the ejected shells upon the floor were fired by some antagonist in the room, some of which may have taken effect in the wall about four feet above the bed, but one of which took effect in the brain of the deceased, after which the deceased fired no more, unless it may have been as a result of a convulsive pressure upon the handle and trigger of the pistol he had, occasioned by the shock of his own death wound. There were three bullet holes found in the walls. In describing these the parties responsible failed to realize the difficulty the court would be in for lack of a key to interpret such descriptions as "here," "there," "over here" and "assuming that this is the wall of the room, and this is the bed, will you indicate to the jury about there (where) these holes were in the wall?" But by as close a study as we can make, we think it fairly inferable that one of the holes was in the ceiling above the bed, over the head of the bed, and that two were in the wall, about four feet high, or that one was in the wall at least about four feet high, and the other was in or near the ceiling, as though they might have been fired across the bed, though by the upward range of the bullet indicating that they might have been or were fired from a position somewhat lower than the bed, but out in the floor.

These circumstances take on an added significance if it be determined that the deceased did not kill himself, and the range of these wild bullets could readily be accounted for by the suggestion that one in the room on the point of being discovered or threatened might have sunk down to avoid discovery or to take advantage in position. There would be little if anything to arrange if the shot caught the deceased in bed, before pulling the door to a spring lock in leaving the premises. Another significant thing is, that

a yellow negro, a stranger in the neighborhood, had visited the deceased about a week before, and a little after midnight Mrs. Nellie Finchain heard a door slam in the neighborhood.

Of course, as will appear, the foregoing are inferences drawn from the proof, and whether regarded as highly fanciful or otherwise, we think they are just as reasonable, or even more so, than an inference of self-destruction. The presumption therefore against self-slaughter was in no way overcome.

The effect of the foregoing is to overrule all the assignments of error except the 7th and last, which is to the effect that John Jennings, attorney for the plaintiff, in his closing argument to the jury asked the jury to return a verdict in favor of the plaintiff, stating that it meant more to the plaintiff than it did to the defendant if a verdict was rendered in favor of the plaintiff. Upon exception, which was sustained, the argument complained of was withdrawn.

Section 6351 of Shannon's Code provides that

"No judgment, decision or decree of the inferior court shall be reversed in the Supreme Court, unless for errors which affect the merits of the judgment, decision or decree complained of."

We do not believe this argument under the circumstances, if unauthorized, affected the merits of the case. If it had done so it would more likely have affected the result as to the penalty. The jury only gave verdict for the one thousand dollars provided for in the face of the policy, with interest, evidencing that their verdict was more in response to the contract proved than to any dictates of prejudice. The case of Pullman Co. v. Pennock, 118 Tenn., 567, was where the amount of the judgment was purely within the reasonable discretion of the jury, the court finding that there was no averment or proof that Pennock was treated with any rudeness or discourtesy, or subjected to unnecessary humiliation authorizing vindictive damages, thought the sum of $500 excessive for the inconvenience suffered in the loss of a berth in a sleeping car, but that it was obtained through prejudice that the argument not based on facts was well calculated to excite; a very different case from the one at bar.

The case of Manufacturing Co. v. Woodall, 115 Tenn., 605, was a personal injury case, and the verdict and judgment was for $3700, another case where damages were within the sound discretion of the jury, to be exercised reasonably, of course, upon the proven facts. It was not permissible to show that defendant had indemnity insurance against loss by accident caused by negligence. Repeated efforts over sustained exceptions were made to show this insurance, evidently for the purpose of influencing

the action of the jury, and finally, notwithstanding exceptions were sustained, in the argument it was again insidiously referred to. Objection was again made, and the motion was made for the direction of a mistrial. The Circuit Judge declined to grant the motion, but sustained the exception. The Supreme Court granted a new trial, saying:

"We regard the present case, in the phase we have been considering, as exceptional in its character, and while, under ordinary conditions, this court will not interfere with the exercise of legal discretion by the Circuit Judge in the limitations he imposes or refuses to impose upon counsel in the conduct of their cases, and in declining a new trial by reason of such conduct, yet, when we find a persistent abuse of well-established and universally recognized rules of correct practice, it is then our duty to interpose, and to do that which should have been done by him. The judgment is therefore reversed and the cause remanded for a new trial."

The case of English v. Ricks, 117 Tenn., 73, was reversed for the admission of incompetent testimony, which evidently affected the merits. In any event the case from which the extract is quoted recognizes that a reversal for improper argument was in the sound discretion of the court and ordinarily will not be interfered with, but the court regarded the case under investigation as exceptional, calling for the exercise of its own opinion as to the merits of the application for a new trial.

Each case must therefore rest upon its own merits in this particular. We are satisfied that the merits of this cause have been reached. All assignments of error are therefore overruled, and the judgment of the lower court affirmed, with costs against defendant.

Portrum and Thompson, JJ., concur.