IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 2, 2001 Session

## PATRICIA WILLIAMS v. CANADA LIFE ASSURANCE COMPANY v. JAMES NELSON WILLIAMS and DEBORAH JEAN ELG

### Direct Appeal from the Chancery Court for Dyer County
No. 97-C492     J. Steven Stafford, Chancellor

---

### No. W2000-03096-COA-R3-CV - Filed July 24, 2001

---

The plaintiff's husband died from a single gunshot wound to his chest which occurred while the two were alone in their home. By whose hand he died was the sole issue at both the trial and on appeal. If the plaintiff's husband shot himself, as she claims, she receives the proceeds from an insurance policy on his life. However, if she shot and killed her husband, as his adult children assert, they receive the insurance proceeds. Following the trial, the chancery court concluded that the death occurred as the result of a suicide. The defendants appealed, arguing that the presumption against suicide compels the conclusion that their father was shot to death by the plaintiff, their stepmother. Based upon our review, we affirm the judgment of the chancery court that the death occurred as the result of a suicide.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed

ALAN E. GLENN, SP.J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

John W. Palmer and Jason L. Hudson, Dyersburg, Tennessee, for the appellants, James Nelson Williams and Deborah Jean Elg.

Charles S. Kelly, Sr., Dyersburg, Tennessee, for the appellee, Patricia Williams.

### OPINION

This appeal resulted from a dispute as to who receives payment from a $50,000 life insurance policy on the life of the deceased husband of the plaintiff. After the insurer had denied payment on the basis of a missing death certificate, the plaintiff filed suit in the Dyer County Chancery Court. The decedent's two children from a former marriage intervened as additional defendants in that suit, filing a counter-complaint and cross-complaint, claiming first that the plaintiff was not the legally named beneficiary of the policy and, further, that their father had not died of a self-inflicted wound but, rather, was murdered by the plaintiff. The intervening defendants asserted that, even if the

plaintiff were the lawfully named beneficiary of the life insurance policy, they were entitled to all of the proceeds of the policy because the plaintiff was barred from taking the proceeds of the policy by Tennessee Code Annotated § 31-1-106, which section codifies the so-called Slayer's Rule.

As to the first issue raised by the defendants, the trial court granted the plaintiff's motion for partial summary judgment, concluding that the plaintiff was the legally named beneficiary of her deceased husband's life insurance policy. Following a two-day bench trial, the trial court concluded that the deceased had committed suicide, and, thus, that the plaintiff should not be precluded from inheriting from him or receiving life insurance benefits. The intervening defendants appealed, presenting, essentially, the single issue of whether the trial court erred in concluding that the decedent committed suicide. They specifically argue that the trial court: (1) failed to find sufficient facts to overcome the presumption against suicide, and (2) failed to give proper weight to circumstantial evidence supporting the claim of homicide. Having reviewed the record and applicable law, we affirm the judgment of the trial court.

**FACTS**

Patricia Williams, ("plaintiff"), testified that she had married Dale Williams in 1990. Mr. Williams was medically disabled when they married. He had two children, James Nelson Williams and Deborah Jean Elg, ("defendants"), by a former marriage. He was some seventeen years older than the plaintiff, and their marriage can best be described as tumultuous. Ms. Williams apparently had a number of romantic relationships outside their marriage. Although she admitted that she did not love her husband, she testified that he was her best friend, and she cared about him. Matthew Wilson, Ms. Williams's eighteen-year-old son by a former husband, who knew of his mother's liaisons, gave a statement to investigators with the Tennessee Bureau of Investigation in which he claimed that Mr. Williams knew about the other men but believed that his wife would change.

Over the course of their marriage, Mr. Williams engaged in an unexplained pattern of faking various aliments, including heart attacks and strokes, as well as his death, in front of his wife. Ms. Williams testified that these faking episodes had occurred some twenty-five times. On one occasion, she called an ambulance to take him to the hospital, although doctors later found nothing wrong. Ms. Williams testified that the faking became "almost like a hobby." He kept a number of all kinds of guns in the house, as well as blank cartridges and vials of fake blood that he used for staged, western-type shootouts.

At some point in April of 1997, after having moved out of their house in Dyersburg to live in an apartment with a boyfriend, Ms. Williams moved back into the home she and her husband had shared. Ms. Williams testified that she moved back because he had asked her to do so. At that time, Mr. Williams was recovering from double hernia surgery. According to her testimony, Ms. Williams was caring for her husband by making certain that he took his medicine and by checking for signs of blood in his urine.

On Thursday, May 1, 1997, and into the early hours of Friday, May 2, the pair were alone in their house. Ms. Williams testified that they argued for hours. They fought about Mr. Williams's daughter. Apparently they also fought about Ms. Williams's leaving her husband for good. According to Ms. Williams, her husband "was just throwing things -- just throwing things everywhere. It didn't matter what he picked up, lamps, ashtrays, it didn't matter. He was just throwing things." Items were smashed using hammers. Ms. Williams testified that she took a small tack hammer and beat it on the table, screaming at him to stop. Finally, things settled down, and the two began cleaning up the broken glass. Mr. Williams said he was going to the bathroom, and she went into the kitchen area where she poured a Pepsi into a glass and placed the glass on the table. Mr. Williams came back into the room and sat down in his chair. She testified as to what occurred next:

> A. Yeah, sat down in his chair, and he looked up at me, like that, and I saw a flash, and then boom, and his shirt just barely - - and I thought, "Nh-uh, you're not doing this to me again."
>
> Q. Did you see a gun or a pistol?
>
> A. I saw a flash, like a - - I didn't see the whole gun. I just saw the flash of a gun, and the boom - - okay - - and he's still sitting there looking at me. So, I'm thinking, "There's no way you could have shot yourself, or you wouldn't be sitting there looking at me."
>
> . . . .
>
> Q. Did you think that when he shot himself that he was faking it again?
>
> A. Yeah, I really did.
>
> Q. Well, what did you do?
>
> A. I remember sitting at the table looking at him, and I remember telling him, "Dale, you're not doing this to me again." And I don't really know how long I sat there. And in my mind, I said, "No, I can't take this." So, I got up and walked in the living room. He was still sitting at the table. I remember walking into the living room, and I stood in there maybe a minute, I don't know, and I went back, and he was still sitting in the chair. I sat down, and I remember I was trying to talk to him, you know, and telling him, "Dale, don't fake me out. I can't stand this." And then he slumped. He didn't foom [sic]. He slumped out of the chair.

Ms. Williams, who has a history of blacking out and of psychiatric treatment, testified that she could not remember what happened over the next hours but remembered sitting on the couch with her legs tucked under her chin. She did remember stepping over Mr. Williams and pulling his hair and slapping his face in an effort to get him to quit faking. Finally, she realized something was wrong, and she testified that she made three calls, one to her boyfriend in Kentucky, one to her brother, and one to a male friend who worked for the ambulance service. It is unclear who actually requested the ambulance. Nevertheless, calls to the ambulance service and to the Dyer County Sheriff's Office occurred some eight to ten hours after the shooting.

Sheriff Jeff Holt testified that he arrived at the scene after the ambulance and entered the house where he observed the body of Mr. Williams lying face down on the floor. He also observed a weapon on a chair to the right of the body. Sheriff Holt testified that the body could have been sitting at the table and fallen out of the chair into the position where he observed it. He noted the damage to the house in that several small items were broken, and the kitchen was in disarray, including broken glass in a china cabinet. Sheriff Holt testified that his department requested assistance in the investigation from the Tennessee Bureau of Investigation ("TBI"), and Agent Brent Booth with the TBI arrived on the scene at approximately 2:30 p.m. while Sheriff Holt was still there.

Agent Booth testified that when he arrived, he found Mr. Williams lying face down on the floor in a pool of blood. He saw a Smith and Wesson .357 revolver in a chair within arm's reach of the deceased.[1] Subsequent laboratory tests failed to reveal any identifiable fingerprints on the gun. Agent Booth also testified that laboratory results showed that two footprints on the back of Mr. Williams's shirt came from shoes belonging to Ms. Williams. Agent Booth further testified that laboratory tests to determine the presence of gunpowder residue on the hands of Mr. Williams were inconclusive. Similar procedures were negative, when used to test the presence of blood or gunpowder residue on a washcloth that Ms. Williams was using when emergency personnel arrived. No vials of fake blood were found in the house. Blank bullets were found at the home, although none fit the weapon used in the shooting. Two hammers were found. Agent Booth testified that he observed an entry wound but no exit wound on the body of the deceased. Based on his experience as a TBI agent, Booth said that the entry wound appeared to be a contact wound. He described a contact wound as one where "the muzzle of the barrel of a firearm is in contact with an object or body that a projectile is fired into."

Dr. Thomas Deering, a forensic pathologist and assistant professor of pathology at the University of Tennessee at Memphis, performed the autopsy. Dr. Deering testified that "[a] contact gunshot wound is when the end of the barrel is actually in contact with the skin." Whether a wound is a contact wound is determined by "looking for evidences of soot and stipple. When a gun is fired, if there's close contact, all the soot, all the unburned carbonatous material goes directly into the wound, as well as any unburned pieces of gunpowder." He testified that his examination of the skin

---

[1]The plaintiff stipulated to the fact that this weapon was the one from which the bullet was fired that entered the chest of Mr. Williams, causing his death.

wound showed that "there was soot around the abrasion ring and inside the wound. In and of itself, that's an indication to me that it's a contact, that the soot and all the particles of gunpowder would go inside the wound."[2] Dr. Deering described the cause of death as "a gunshot wound to the chest with severe injury to the heart, the aorta, and the left lung, with severe bleeding associated." When asked on cross-examination if the injuries were consistent with an entry wound that went slightly right to left, such as a self-inflicted gunshot wound by a right-handed person, Dr. Deering responded, "The main direction is from front to back, and I would say very slightly from the individual's right to his left," but did not specifically say that the wound was consistent with a self-inflicted wound. Dr. Deering testified further that the shot would not necessarily have immediately immobilized Mr. Williams. "There may be a period of five or six seconds where he has purposeful activity," according to Dr. Deering. During this time, it would have been possible for Mr. Williams to place the gun on a chair near him, although Dr. Deering noted that no trail of blood to the chair where the gun was found appeared in the photographs of the scene, meaning that it was "not likely" the victim had done so.

Dr. James E. Naifeh, Jr., medical examiner for Dyer County, signed the death certificate for Mr. Williams. In his deposition, included in the record before this court and admitted as proof in the trial, Dr. Naifeh testified that the first death certificate he signed on May 27, 1997, noted the cause of death as "pending" because Dr. Naifeh had not received the autopsy report. Once he had the autopsy report of Dr. Deering, Dr. Naifeh contacted District Attorney General Phil Bivens, and, based on information from General Bivens, Dr. Naifeh completed a form entitled, "Delayed Report of Diagnosis—Death." On this form, signed and dated October 30, 1997, by Dr. Naifeh, the cause of death was listed as "multiple gunshot wounds" and the manner of death was checked as "murder." Dr. Naifeh testified that he indicated that murder was the manner of death based solely on information he received from General Bivens. Dr. Naifeh was uncertain as to how the error was made concerning the multiple gunshot wounds. Dr. Naifeh also testified concerning corrections he made to the Delayed Report of Diagnosis dated October 30, 1997. On this corrected form, the word "multiple" was typed through with a single line and above it the word "single" was typed. The final "s" on the word "wounds" was apparently "whited-out," leaving the cause of death as single gunshot wound. The box that had been checked to show manner of death as murder was marked through with a single line of a pen, and the box indicating that the manner of death was "suicide" was checked. The following exchange between Dr. Naifeh and counsel for the defendants occurred:

> Q.    Do you recall what information that you obtained from Mr. Bivens that caused you to make those changes?
>
> A.    Yeah. I remember discussing it with Phil. I don't remember exactly when it was. And he said they didn't have any evidence to

---

[2]Dr. Deering was not sent the shirt that Mr. Williams was wearing at the time of the shooting. However, the shirt was sent to the TBI laboratory, according to Agent Booth, and was determined to have a bullet hole in it and gunpowder residue. Tests revealed that the pattern of residues like that on the shirt could be produced at muzzle to garment distance greater than contact but less than twelve inches.

show that this was now a homicide -- or that he was considering this to be a suicide as opposed to a homicide. He didn't really elaborate.

If I remember the autopsy report, it -- sometimes a pathologist can make the determination. In this case, you can't make a determination. All they can say is this was a gunshot wound to the chest with, I think burns to the chest up close. It could be suicide; homicide in some circumstances.

And I think, I guess with Phil's evidence, whatever he had, he determined it to be a suicide as opposed to a homicide. And he notified me or I called him. I can't remember if he called me or I called him. But we talked about this, and he said he was classifying this as a suicide.

Q. Based on what he told you, you put on the death certificate "suicide"?

A. Correct.

The trial court determined that "based upon the proof presented and based upon the law this Court has to deal with, the Court finds that the presumption against suicide has been rebutted and that the proof reveals, by a preponderance of evidence, that Mr Williams, in fact, committed suicide."

## ANALYSIS

### Standard of Review

Because this is an appeal from a decision of the trial court following a bench trial, the standard of review for this court is governed by Tennessee Rule of Appellate Procedure 13(d), which states, in pertinent part: "Unless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." Elrod v. J.C. Penney Life Ins. Co., No. M1999-02195-COA-R3-CV, 2000 WL 798651, at *3 (Tenn. Ct. App. June 22, 2000) (citing The Realty Shop, Inc. v. RR Westminster Holding, Inc., 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). In addition, we note that "[b]ecause the trial judge is in a better position to weigh and evaluate the credibility of witnesses who testify orally, we give great weight to the trial judge's findings on issues involving credibility of witnesses." Randolph v. Randolph, 937 S.W.2d 815, 819 (Tenn. 1996) (citing Gillock v. Board of Professional Responsibility, 656 S.W.2d 365, 367 (Tenn. 1983)).

**DISCUSSION**

At the conclusion of the trial in this matter, the trial court, finding for the plaintiff, ruled as follows:

> The Court is required to examine this evidence in light - or required to examine all of the evidence in light of the controlling law. As I began this summation a few moments ago, I stated that there is a presumption against a person committing suicide in the State of Tennessee. That is a rebuttal [sic] presumption. The Court must consider all of the evidence in determining if that presumption has been rebutted, and that presumption continues on throughout the trial of the case until the Court makes a decision.

> There is also a presumption against murder in this State that also is contained in the Nichols case I mentioned earlier. However, in a civil case, the presumption against suicide is greater than that against murder. So, we are to presume that suicide is not the cause of death. However, in examining the testimony, the Court makes the following findings, and the Court places great weight on this finding; that is the testimony of Dr. Derring [sic]. On cross examination, Dr. Derring [sic] was asked if the wound suffered by Mr. Williams was consistent with a self-inflicted gunshot wound. He testified that it was. Dr. Derring [sic] had examined all the facts and the circumstances, and the Court places great weight on what Dr. Derring [sic] has to say. The only proof that the Court has before it is the direct testimony of Ms. Williams as to the cause of Mr. Williams' death. The proof submitted by Dr. Derring [sic] clearly reveals that Ms. Williams' explanation of Mr. Williams' death is not inconsistent with the physical proof. There are unanswered questions, and the Court has already noted those unanswered questions. However, for the Court to find that Ms. Williams intentionally killed Mr. Williams, as contemplated by the statute [Tennessee Code Annotated Section 31-1-106], the Court would have to engage in speculation and conjecture. The Court is unable to do that, according to the law of evidence and the rule of law in this State.

Implicit in the trial court's ruling was the finding that the plaintiff's testimony was truthful when she testified that her husband committed suicide. The defendants argue that the trial court erred in finding that the death resulted from suicide. They assert that the evidence fails to overcome the presumption that the death did not occur as the result of suicide and that, in fact, it preponderates in favor of murder as the manner of death. We will now examine these contentions.

-7-

In our consideration of this matter, we note, as did the trial court, there are two operative presumptions, that against suicide and that against homicide.

## Presumption Against Suicide

The presumption against suicide is an evidentiary rule created by Tennessee law when "the cause of a person's death in a civil case is an issue." Neil P. Cohen et al., Tennessee Law of Evidence § 3.07, at 3–12 (4th ed. 2000) (footnote omitted). The presumption against suicide is based on what this court has described as a "well known fact that almost universally people love and will defend their lives vigorously, even desperately, rather than destroy it, . . . ." Metropolitan Life Ins. Co v. Staples, 5 Tenn. App. 436, 441 (1927) (citations omitted). The usual context for application of the presumption against suicide is when a plaintiff seeks to establish that the death of the insured "resulted from a cause liability for which was assumed by the policy." Provident Life & Accident Ins. Co. v. Prieto, 83 S.W.2d 251, 258 (Tenn. 1935). Juries and courts are "properly reluctant after the policyholder has been silenced by death to conclude that he came to his end by his own voluntary act." Bryan v. Aetna Life Ins. Co., 160 S.W.2d 423, 427 (Tenn. Ct. App. 1941). The presumption is rebuttable. "If the facts and circumstances attending death leave it reasonably doubtful as to whether it was caused by accidental means or by suicide, the presumption against suicide comes to the aid of the plaintiff, and casts on the defendant the duty of going forward with the proof and establishing the defense of suicide by a fair preponderance of the evidence." Prieto, 83 S.W.2d at 258.

The circumstances of this case vary from those where the presumption against suicide is typically operative. More commonly, the presumption against suicide is utilized when an insurance beneficiary and the insurance company cannot agree as to the cause of death, which affects whether the company must pay the proceeds of the policy. Here, however, secondary beneficiaries of the policy seek to utilize the presumption against suicide to compel the conclusion that the death resulted from an act of murder.

## Presumption Against Homicide

Also operative in this matter is the presumption against homicide. In 1891, our supreme court concluded that the following was a correct statement of the law: "'The presumption of the law is that Bennett did not commit suicide, and was not murdered.'" Accident Ins. Co. of North America v. Bennett, 16 S.W. 723, 724 (Tenn. 1891). In the same year, another decision of our supreme court cited Bennett, repeating the proposition that "[i]n civil cases, when one has been found dead, even with marks of violence, nothing else appearing, the presumption is that deceased did not commit suicide, as also that he or she was not murdered." Persons v. State, 16 S.W. 726, 727 (Tenn. 1891). Both Bennett and Persons are relied on by our supreme court in Nichols v. Mutual Life Ins. Co. of New York, 156 S.W.2d 436 (Tenn. 1941). The Nichols court added: "It would seem, therefore, that in a civil case the presumption against suicide is greater than that against murder, and the trial court committed error in charging the jury that these two presumptions cancel each other." Id. at 439. The manner for applying these conflicting presumptions was explained by our supreme court in Milstead

v. Kaylor, 212 S.W.2d 610 (Tenn. 1948): "We have here two conflicting presumptions, one of which is said to offset the other so as to make the cause of death conjectural. This is an erroneous legal conclusion. It is a well established rule that these presumptions 'should be measured and that the weaker should be deemed to be overcome by the stronger.' Recognizing this distinction, it is the duty of the Court to consider the probative force of the respective presumptions." Id. at 613 (citations omitted).

In determining the issue of the manner of death of Mr. Williams, the trial court placed great weight on the testimony of Dr. Deering, the dependence upon which the defendants challenge because initially the court erroneously attributed to Dr. Deering the conclusion that the wound was consistent with a self-inflicted gunshot wound. The trial court acknowledged its incorrect statement by order dated July 18, 2000, but stated that, even without such proof from Dr. Deering, its determination that the death of Mr. Williams was a suicide should remain in full force.[3] The trial court noted that Dr. Deering also testified that the gunshot wound was a contact wound, that is one where the gun is held up against the body and fired. Dr. Deering further testified that it was possible that Mr. Williams's body stayed in the chair before slumping to the floor and that there would have been some seconds following the gunshot when Mr. Williams could possibly have placed the gun where it was found in a chair. Dr. Deering did not view the scene with the body, but from photographs, testified that he thought such purposeful movement unlikely. Agent Booth testified that the gun was found within "arm's length" of the body. There was indication of other bruising to Mr. Williams's body, but Dr. Deering testified that these bruises could have occurred as the body fell to the floor. There was no explanation concerning what appeared to be facial scratches. The trial court heard the testimony of the only witness to the events, Ms. Williams, and found her testimony consistent with the physical evidence. Her testimony concerning Mr. Williams's penchant for play acting and faking harm to himself was uncontroverted. Previously, Mr. Williams had put a gun to his head and fallen on the floor with his eyes closed and then held his breath. Ms. Williams explained the lapse of some eight hours from the time of the shooting until she called for assistance as being, partially, the result of her determination that this was just another episode of play acting. She also testified concerning previous episodes of her blacking out, once at the time of her father's funeral and again at the death of her infant son, implying that she may have simply blacked out on the occasion of the shooting. Mr. Williams had recently undergone surgery for a double hernia and also had heart problems. Ms. Williams noted in her statement to the TBI that Mr. Williams had been depressed about living and had become enraged on two occasions before the events leading up to the shooting. There was some evidence that Ms. Williams intended to divorce Mr. Williams and that he may have been angry over this possibility. On cross-examination, she said that on at least one occasion, while angry, she had threatened to kill her husband.

Although the presumption against suicide is based on the belief that self-destruction is contrary to human nature, that is not to say that the court must "shut[ ] its eyes to the fact that men,

---

[3]A cause of the confusion may have been that, although the trial court allowed, over objection of defense counsel, the plaintiff's counsel to ask whether the wound was consistent with a self-inflicted wound, plaintiff's counsel apparently decided not to pursue that line of questioning.

without any apparent reason, do commit suicide." Bryan, 160 S.W.2d at 427. Most significant is the fact that this was a contact wound and that the course of the bullet was from front to back and slightly to the left. Accordingly, we conclude, as did the trial court, that the evidence here was sufficient to meet the plaintiff's burden of rebutting the presumption against suicide by a preponderance of the evidence.

Additionally, the defendants assert that the evidence preponderates in favor of murder by Ms. Williams, that is to say, that they have rebutted the presumption against murder by a preponderance of the evidence. In support of their assertion, the defendants point to certain aspects of the forensic evidence as being probative of murder, specifically, that the angle of the gunshot was only slightly right to left; that the entry of the gunshot was described by Dr. Deering as being "front to back", an angle contrary to a self-inflicted wound; that there were unexplained scratches on Mr. Williams's face. The defendants also assert that the position in which the gun was found indicates that Mr. Williams did not put it there. The defendants further support their theory of murder by pointing to evidence that the relationship between Mr. and Mrs. Williams was volatile; that Ms. Williams had a "short fuse"; that the two were alone in the house when Mr. Williams was shot; that no fake blood or blank bullets fitting the gun used in the shooting were found in the house; that Ms. Williams had asked Mr. Williams about his will; that Ms. Williams did not love Mr. Williams; and that Ms. Williams remarried, divorced, and changed her name back to "Williams" after the death of Mr. Williams. The defendants note that Ms. Williams was using a washcloth when the ambulance arrived; that there were no identifiable fingerprints on the gun; and argue that someone had obviously been cleaning up the debris from the smashing and breaking of items before the police arrived, possibly to destroy evidence. In view of these facts, the defendants argue, the trial court should have concluded that the decedent was killed by the plaintiff.

In Hollingsworth v. Queen Carpet, Inc., 827 S.W.2d 306, 309 (Tenn. Ct. App. 1991), this court explained the effect of circumstantial evidence upon the burden of persuasion:

> In a civil case depending on circumstantial evidence it is sufficient for the party having the burden of proof to make out the more probable hypothesis and the evidence need not arise to that degree of certainty which will exclude every other reasonable conclusion. *Bryan v. Aetna Life Ins. Co.*, 174 Tenn. 602, 130 S.W.2d 85 (1939). In a civil case, where the plaintiff's case depends upon the circumstantial evidence, it is necessary for the plaintiff to present proof which, if believed by the trier of fact, makes the plaintiff's theory of the case more probable than the theory of the defendant. *Benson v. H.G. Hill Stores, Inc.*, 699 S.W.2d 560 (Tenn. App. 1985).

During the trial in this matter, the plaintiff testified that her husband committed suicide. She was subject to cross-examination on all of the circumstantial evidence which the defendants argue compel the conclusion that the decedent was murdered by her. However, after hearing the witnesses testify and applying the relevant presumptions, the trial court determined that it would have to

-10-

engage in "speculation and conjecture" to conclude other than that the decedent died by his own hand. Applying the appropriate standard of review, we cannot conclude that the trial court erred in this conclusion. As the trial court noted, in circumstances such as those here, there are questions that simply will never be definitively answered. Nevertheless, we conclude, as did the trial court, that the evidence preponderates in favor of suicide.

## CONCLUSION

Based upon the authorities and the reasoning set out herein, we affirm the judgment of the trial court in favor of the plaintiff. Costs of this appeal are taxed equally against the defendants, James Nelson Williams and Deborah Jean Elg.

 

_____
ALAN E. GLENN, SPECIAL JUDGE